Matter of S. Children (2005 NY Slip Op 51964(U))

[*1]

Matter of S. Children

2005 NY Slip Op 51964(U)

Decided on November 29, 2005

Family Court, Kings County

Freeman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 29, 2005

Family Court, Kings County
In the Matter of the S. CHILDREN, Alleged to have been abused by MARGARET S., MICHEL S., Respondents.
Na-10081-83/03

For Petitioner Administration for Children's Services-Kenneth Robinson, Esq.
For Respondent Margaret S. - Michael S. Somma, Esq.
For Respondent Michel S. - Jane Fosbinder, Esq.
Law Guardian for Genisse S.- Virginia Geiss, Esq.
Law Guardian for Rachel and Cristel S. - Steven London, Esq.

Nora Freeman, J.
These petitions alleging sexual abuse of his adopted daughter Genisse by respondent
Michel S. were filed in January, 2003, shortly after seventeen-year-old Genisse disclosed his conduct to school personnel. The Administration for Children's Services ("ACS") alleged in its petitions that Michel S. had sexually abused Genisse over a period of years; that his wife Margaret knew of the abuse and failed to protect her daughter; and that the two younger daughters Rachel and Cristel were at risk of similar abuse. The fact-finding hearing continued from October 2003 through June 2005. ACS presented only one witness, Genisse (who was eighteen by the time she finished testifying on January 23, 2004) and one exhibit, the oral report transmittal or "ORT" filed by the school psychologist to whom she disclosed the abuse. At the conclusion of ACS's case, respondents made no prima facie motions. The respondents' case consisted of four witnesses: both respondents, Mrs. S.'s mother, and a family friend whom Genisse claimed to have told about the sexual abuse years earlier.
The trial evidence
The evidence at the hearing may be summarized as follows: Genisse's account is that, [*2]the day after her mother discovered a "hickey" on her chest (in the summer following sixth grade), her adoptive father told her he had been instructed by a doctor to insert his penis into her vagina to see if she was pregnant. He did so, taking her into his bedroom after he had driven her mother to work. She testified that he continued to abuse her sexually, including penile/vaginal contact and masturbation while pressed against her, throughout her seventh and eighth grade school years. The abuse would occurr in the family home, after her mother went to work, despite several other family members residing there; they were described at different times as a grandmother, the grandmother's boyfriend, two younger sisters, and various cousins whose sojourns were never made clear. Genisse testified that the abuse stopped in December of her eighth grade year, when a cousin (Beatrice) came to live with the family and shared her bedroom. When she was in the ninth grade, Genisse told her mother that Michel S. "took her virginity" the day after she had come home with the hickey. Genisse testified that her mother's only response was to ask, "What do you want me to do?" to which Genisse replied, "I don't know." Genisse testified that the next day, her mother told her she had consulted a lawyer, and that if she was lying the family could be deported. The discussion ended there. Genisse recounted that a few months later her mother sent her to live with relatives in Georgia, because of unspecified "problems" they were having.
Genisse testified further that she returned to her mother's home in May 2002, at the end of her tenth grade year; that she began eleventh grade that fall; and that there was no further sexual abuse. However, she testified that both her mother and Michel S. called her names,
including "slut," and frequently reprimanded her for coming home late. Genisse testified that she joined the track team that year, in order to get out of the house where she was uncomfortable in Mr. S.'s presence, and that her mother didn't believe that she was on the team, or that the
practices lasted until after eight or nine o'clock in the evening. Finally, in January, 2003, she simply did not return home from school. At school, she was called in to speak to Dr. Susan L., the school psychologist, who told her that her mother had called or come to the school
 looking for her. It was then that she told Dr. L. about the sexual abuse, her discomfort in the home and wish to leave. Dr. L. filed the ORT (Petitioner's Exh. A) and ACS began its investigation.
Genisse also testified that she had confided in two other people before she spoke to Dr. L.: her cousin Esther E. and another "cousin" Marielle. She told Esther what was going on "throughout" the period, but spoke to Marielle only once, just before she left for Georgia, when Marielle asked her "the real reason" she was going to Georgia. ACS did not call either of these women as witnesses, but Esther was called as respondents' witness.
Respondents' first witness was Rachel Burrows, Margaret S.'s elderly mother, who testified on three separate dates. Her testimony must be discounted because it is inherently unreliable. She, like the respondents, testified with the assistance of a Creole interpreter, but she was so excitable and often distraught that she had difficulty responding to the questions asked, frequently interrupted the interpreter to speak, and upon arriving in the courtroom claimed that the case might cause her to have a heart attack. (That statement was blurted out before the case
was officially called on the record.)
[*3]
It was stipulated that Mr. S. had brought his wife's daughter Genisse, then nine years old, from Haiti to the US in 1995, and subsequently adopted her. It is undisputed that Mrs. S. left two-year-old Genisse in Haiti when she herself migrated to the US and that her second child, Rachel, was born in the US and always lived with her. Both resopndents testified that Genisse was not an affectionate child; that she never hugged her mother; that she frequently hit her younger sister; that she wouldn't listen and began staying out late in seventh grade; that she was, in a word, difficult. Only Mrs. S. saw the hickey that Genisse had on her chest the summer after sixth grade; she told her husband about it. Mr. S. denied ever sexually abusing Genisse; indeed, he claimed that with his work hours, usually six days a week, leaving home at around 5 AM and returning around 6 PM, he was seldom home. He also reiterated that with up to ten people living with the family at different times, he was never alone with any of the children. Both respondents testified that they sent Genisse to Georgia because of her persistent acting-out and school problems. Mr. S., who drove a taxi, testified that he often saw her out on the street during school hours. Both testified that Genisse stayed out late and they were
worried that she was involved with boys. (After twelve-year-old Genisse came home with the hickey, Mrs. S. took her to a doctor to be "checked," but the doctor told her
"nothing," she testified.)
Mrs. S. testified that Genisse returned home after one year because the Georgia relatives would not keep her, due to her disrespectful behavior. Both respondents testified that Genisse's behavior continued to be unacceptable, and eventually, Mr. S. told her something to the effect that, if she didn't stop coming in late, either she would have to leave the house or he would. Some time after that conversation, Genisse went to school in January, 2003, and did not return home. Mr. and Mrs. S. were then informed that Genisse was charging her adoptive father with sexual abuse, and that her mother knew and did nothing to protect her. Both respondents believe that Genisse was, and is,lying.
Respondents also called Esther E., twenty-one years old, who testified that she is not related to Genisse, but Genisse's mother, Margaret S., is her mother's best friend. Ms. E. testified that she visited the S. home "maybe twice a year" with her mother; that during these visits she spent time with all the children watching TV, not alone with Genisse; and that Genisse never told her that Michel S. was molesting her. She also testified that she learned about Genisse's charges about two years ago (shortly after the petitions were filed) and that her mother was very upset. However, she did not know "my name had become involved" until about a year later, when "Michael" (presumably Michael S. Somma, counsel for Margaret S.) called and informed her. When she was told by "Michael" that Genisse had testified that she had confided in her, Esther asked Michael "What do you want me to do?" Ms. E. testified that no one asked her to lie.
Applicable Law
In a case such as this, the Court's determination rests on its assessment of credibility.
"Issues of credibility are for the court to resolve." See Matter of Peter C, 278 AD2d 911 (4th Department 2000), Matter of Kaitlyn R, 267 AD2d 894 (3rd Dept. 1999). Further, "where, as here, the hearing court was confronted primarily with issues of credibility, its factual findings [*4]must be accorded great weight." Matter of Peter C, supra, citing Matter of Elena A, 194 AD2d 608. (2d Dept. 1993). In this case, respondents made no prima facie motions. But even if such
 motions are made and the Court finds that petitioner has presented a prima facie case, the respondents' burden is merely one of "going forward to rebut the evidence of parental culpability." Matter of Tiffany F, 205 AD2d 429 (lst Dept. 1994) The Court of Appeals has clarified that "once a petitioner in a child abuse case has established a prima facie case, the burden of going forward shifts to respondents to rebut the evidence of parental culpability. But . . the burden of proving child abuse always rests with petitioner; shifting the burden of explanation or of going on with the case does not shift the burden of proof.'" (Matter of Philip M, 82 NY2d 238, 244 (1993). The Court of Appeals continued, "While the fact finder may find respondents accountable for sexually abusing a child or allowing sexual abuse to occur after a prima facie case is established, it is never required to do so." [citations omitted; emphasis added] Id. In this case, respondents did not merely argue that petitioner's evidence is weak. Both of them testified, as well as two additional witnesses. Cf. Matter of Jasmine A, 18 AD3d 546 (2d Dept. 2005)
When weighing credibility, the trier of fact considers not only the words of the testimony but the speaker's vocal tone, delivery, and demeanor, as well as any inconsistencies in the account. In this case, both respondents testified with the assistance of a Creole interpreter. This
process renders testimony slow, repetitious, and sometimes questionable, particularly with respect to subtleties. Genisse and her mother testified in calm tones, while Michel S. was, more than once, tearful, both while listening to Genisse testify and during his own testimony. Of
course, tears and sobbing may indicate many things: the shame of guilt or the grief of a child's
betrayal; fear of being "caught" or fear of being wrongfully found guilty.
The Court noted minor inconsistencies (particularly regarding dates and the occupants of the family's several homes) throughout the testimony of Genisse and respondents. Most of these are of little consequence. However, the Court is troubled by Genisse's testimony on November 7, 2003 that Michel's sexual contact ended in December of her eighth grade year, in contrast to her testimony on January 23, 2004 that her younger sister Rachel interrupted an incident in the living room in the summer after her ninth grade year. Genisse testified repeatedly that her cousin Beatrice came to live with the family (sharing her bedroom) in December of eighth grade and Michel S.'s behavior ceased; that she told her mother during her ninth grade year that
 "Michel took her virginity," and that she was sent to live in Georgia after completing ninth grade. The testimony that Rachel observed Michel "on top of me" on the living room sofa in the summer after ninth grade indicates another act of abuse roughly a year-and-a-half after the
abuse was supposed to have ended. (The Court has noted earlier the understandable difficulties
all the witnesses had with specific dates/years, but believes that a teenager is likely to be more
accurate when referring to the grade she was in at the time of an event.) The greatest
inconsistency, however, (aside from Genisse's accusations and respondents' denials) is that between Genisse's testimony that she had confided in Esther E. "throughout" the abuse, and Ms. [*5]E.'s that Genisse never said a word; that they were not close friends; that she barely saw her. Ms. E., although not a family member, is respondent Margaret S.'s god-child and serves as godmother to Margaret's youngest child Cristel. However, based on her testimony that she visited "maybe twice a year," these titles seem more formal than substantial.
Petitioner's theory of the case is that respondent Michel S. sexually abused and exploited his adopted daughter, and that his wife's family, largely dependent on his income, simply looked the other way. Respondents argue that Genisse, after being left in Haiti for seven years, never warmed to her mother, who had made a new life, with a new family, in New York; that she resented Mr. S., whose adoption she claims to have been unaware of; that Genisse's own behavior prompted her parents to send her to relatives when she was fourteen-fifteen; and that she concocted a story that would allow her to leave her mother's home for good, while placing blame on her mother and adoptive father.
There is evidence in the record to support both theories. The Court has reviewed all the testimony given on twelve dates, and concludes that the evidence presented by ACS is simply no more persuasive than that presented by the respondents. Genisse's account raises some obvious questions, such as how the abuse could have continued undetected for years in a home occupied by so many people, including a grandmother who seldom left the house; and why Genisse would wait for several months after the abuse ended to tell her mother. The respondents' explanation for sending Genisse to live with relatives in another state is plausible. The Court has heard many Brooklyn parents announce their hope that a teenager's behavior will improve if sent "down South" to live with relatives.
The Court is mindful that it is the purpose of Article 10 of the Family Court Act to "help protect children," "to help safeguard their physical, mental and emotional well-being," and "to
provide a due process of law for determining when the state . . . may intervene against the wishes of a parent on behalf of a child." (FCA 1011) By weighing the testimony and assessing the credibility of the witnesses, the Court has fulfilled its role as finder of fact. When the accounts of both petitioner and respondent are equally plausible, the petitions must be, and these are,
dismissed.
The Clerk shall enter orders of dismissal, and copies of this Decision are to be mailed to counsel for the parties. The orders of dismissal are stayed until Monday, December 5, 2005.
Dated: Brooklyn, New York
 November 29, 2005
_______________________________
J. F. C.
7